IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **UNION TELEPHONE COMPANY,**<br><br>    Plaintiff,<br>vs.<br><br>**THE PUBLIC SERVICE COMMISSION OF UTAH, TED BOYER, RICHARD M. CAMPBELL, RON ALLEN, AND QWEST CORPORATION ,**<br><br>    Defendants, | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:08CV495DAK |

Pursuant to 47 U.S.C. § 252(e)(6), a section of the Telecommunications Act of 1996, P.L. 104, 110 Stat. 56 (1996), Plaintiff Union Telephone Company dba Union Cellular ("Union") brings this appeal requesting judicial review of the Utah Public Service Commission's ("PSC") Report and Order issued April 3, 2008, and a subsequent Order issued May 30, 2008.  The PSC's orders were issued with respect to an interconnection agreement between Union and Defendant Qwest Corporation.

On June 22, 2009, the court held oral argument on Union's appeal.  At the hearing, Plaintiff Union was represented by Bruce S. Asay and Stephen F. Mecham, Defendant Qwest was represented by Gregory B. Monson and Thomas M. Dethlefs, and Defendants PSC and its individual commissioners were represented by Sander J. Mooy and Ruben H. Arrendondo.  After carefully reviewing the parties' written submissions and oral arguments, as well as the facts and law relevant to this matter, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Qwest is an incumbent local exchange carrier ("LEC") providing local exchange service and intraLATA toll service in 14 western states. Union is a commercial mobile radio service ("CMRS") providing wireless cellular service in Wyoming, Idaho, Colorado, and Utah.[1]

The parties have a long and somewhat contentious history in attempting to reach an interconnection agreement. Because the parties could not negotiate an interconnection agreement, on September 30, 2004, Qwest filed a petition with the PSC, pursuant to 47 U.S.C. § 252(b), for arbitration of an interconnection agreement with Union. The parties then requested the PSC to stay the proceedings while they tried to negotiate an agreement. After lengthy negotiations, the parties narrowed the issues in dispute, and thus requiring arbitration by the PSC, to six.

Union's appeal to this court focuses solely on the PSC's decision relating to compensation for non-local calls. The FCC has defined the local calling area for wireless calls as a major trading area ("MTA"). Calls exchanged between Qwest and Union customers within the same MTA are local calls ("intraMTA") and are not in dispute. Calls exchanged between Qwest and Union customers in different MTAs are non-local calls ("interMTA"), and compensation due to Union on non-local calls is the issue Union raises in this appeal.

The two provisions of the proposed interconnection agreement relating to Union's compensation to Qwest for non-local calls are Section 6.3.8.14 and Section 6.3.9.1. Section 6.3.8.14 provides as follows:

---

[1] Union Telephone Company also operates as an incumbent LEC, providing wireline service in certain local exchange areas in Southwestern Wyoming, Northeastern Utah, and Northwestern Colorado. The case does not involve interconnection between Qwest and Union Telephone Company ("Union Telephone"), the incumbent LEC.

> If Union is direct Billing Qwest, the L-M InterMTA factor will be
> applied to the billed land to mobile minutes of use originated from
> Qwest's network and terminated to Union and deducted from
> Qwest's total L-M MOU.  No Reciprocal Compensation will be
> paid by Qwest to Union for such traffic.  Qwest may bill Union
> interstate switched Access Tariffed rates for this traffic.

Resp. Brief of Qwest Corp., at Appendix 53.  And Section 6.3.9.1 provides as follows:

> Applicable switched Access Tariff rates apply to Non-Local Traffic
> routed to a Toll/Access Tandem, Local Tandem, or directly to an
> End Office.  Applicable switched Access Tariff rates also apply to
> InterMTA and Roaming Traffic originated by, or terminating to
> Qwest.  Relevant rate elements could include Direct Trunk
> Transport, Tandem switching, Tandem Transmission, and Local
> switching, as appropriate.

Resp. Brief of Qwest Corp., at Appendix 54-55.  Union proposed alternative language making payment under these provisions reciprocal, but the PSC determined that such changes were not in accord with the Telecommunications Act and FCC regulations.

Another provision of the proposed interconnection agreement deals with Qwest's compensation to Union when Qwest is acting as a long-distance carrier on non-local calls. Section 6.2.4.3.4 provides that "Qwest will be responsible for payment of appropriate termination charges to the terminating company."  Resp. Brief of Qwest Corp., at Appendix 55.

## DISCUSSION

The parties disagree as to the appropriate characterization of the issue on appeal.  Union broadly states that the issue is whether it is entitled to compensation for completing non-local calls delivered directly from Qwest.[2]  Qwest contends, however, that the appropriate formulation of the issue must focus more specifically on the issues before the PSC and the determinations

---

[2] Union, however, does not ask this court to set the appropriate amount of compensation. At the hearing, Union acknowledged that the PSC can properly set the appropriate amount of compensation.

made by the PSC. The PSC does not make general findings on general issues. Rather, the PSC rules only on disputed provisions of the proposed interconnection agreement. Qwest states that the issue on appeal is whether the PSC properly ruled that Qwest's proposed language for Sections 6.3.8.14 and 6.3.9.1 of the Interconnection Agreement are in compliance with the Telecommunications Act and its implementing regulations.

In reviewing the PSC's orders, this court is similarly limited to determining the validity of the language in the proposed interconnection agreement. A general issue, such as compensation due to Union, may well be answered by the court's analysis of a specific provision. There is no basis, however, for the court to rule on an issue not implicated by a disputed provision of the agreement.

The parties also dispute the applicable standard of review. Union contends that there are no findings of fact relevant to the issue on appeal. Qwest, however, asserts that there are factual issues that affect the application of legal principles to the disputed provisions in the interconnection agreement. The court agrees with Qwest that certain facts are relevant to the PSC's decision and this court's review of that decision. Therefore, while the court reviews the PSC's legal decision under a de novo standard of review, the underlying factual findings are upheld if they are supported by substantial evidence. *U.S. West Communications, Inc. V. Sprint Communications Co.*, 275 F.3d 1241, 1248 (10th Cir. 2002).

As to the merits of the appeal, the court must review the PSC's rulings with respect to each disputed provision. The parties appear to have narrowed some of their disputes at oral argument. The court, therefore, will address each provision in turn.

The PSC concluded that Section 6.3.8.14 of the proposed interconnection agreement cannot be made reciprocal, as requested by Union, because the section applies only to land-to-

mobile calls under the agreement and Union makes only mobile-to-land calls in its interconnection with Qwest. Union argues that it has fixed mobile that is considered land rather than mobile. Although the characterization of whether fixed mobile should be considered a land or mobile call appears to be a question of fact, if it is a land call as Union suggests, that type of call would create a land-to-land call, not a land-to-mobile call which is governed by Section 6.3.8.14. The changes Union requested to Section 6.3.8.14 did not change the "land to mobile" language. Moreover, a land-to-land call would not appear to fall under the mobile interconnection agreement at issue in this case because the agreement is for Union's mobile services.

Next, the PSC concluded that Section 6.3.9.1's requirement that access tariff charges be paid to the terminating carrier on interMTA calls cannot apply to Union because Union, as a CMRS, is not permitted to have access tariffs. Union claims that the PSC's Order unfairly requires it to provide a service to Qwest without compensation. When a Union wireless customer makes a non-local call to a Qwest customer, Union has to pay Qwest's access tariff charge. But, when a Qwest customer makes a non-local call to a Union wireless customer, Qwest does not have to pay Union.

This difference in treatment, however, is based on the differences in the nature of the parties' businesses. Qwest customers typically use an interexchange carrier ("IXC"), or long-distance carrier, for non-local calls. Whereas, Union, as a CMRS, provides long-distance service directly to its customers. Access charges for non-local calls are to be paid to the LECs providing originating and terminating access by the IXC that is compensated by the caller for carrying the non-local call, not by the LEC providing originating access. Union agreed at oral argument that non-local calls involving a third-party IXC require the IXC to compensate the originating party

and the terminating party. Union agrees, therefore, that when Qwest transfers a non-local call to an IXC and Union terminates that call, Union must look to the IXC for compensation on that call.[3]

At the hearing, Union limited its dispute to only non-local calls from a Qwest customer to a Union customer in which Qwest acts as the IXC. Qwest, however, asserts that a separate provision of the interconnection agreement applies to Qwest's compensation to Union for those types of calls. Section 6.2.4.3.4 specifically applies to non-local calls from a Qwest customer to a Union wireless customer where Qwest is the long-distance carrier. For those calls, Section 6.2.4.3.4 provides that "Qwest will be responsible for payment of appropriate termination charges to the terminating company."

Qwest argues that Section 6.3.9.1 should not be revised to make payment reciprocal because 6.2.4.3.4 already provides that Qwest will compensate Union when Qwest acts as the IXC and Section 6.3.9.1 cannot apply reciprocally because it refers to switched access tariff rates. Union, as a CMRS, is not entitled to a switched access tariff. Union recognizes that it does not have its own tariff, but seeks to use Union Telephone's tariff or Qwest's tariff.

---

[3] Because Union acts as the IXC for its customers, however, it is in a different position than Qwest. Union does not originate a call and then transfer it to an IXC. Rather, it sends the call directly to Qwest, who terminates the call. Because Qwest terminated the call and Union acted as the IXC, Union must compensate Qwest for using Qwest's termination services. Union's written memoranda to the court appear to dispute whether Union acts as an IXC (long-distance carrier) for its customers' non-local calls. But, at the hearing, Union appeared to recognize that it acts as an IXC for non-local calls placed by its customers. Union's calling plan clearly states that it is the long distance carrier for its customers. It is clear that Union does not offer its customers a choice of a different long-distance carrier. And, in practice, Union does not transfer a non-local call placed by its customer to an IXC. When Union acts as the carrier on a non-local call, it is acting as an IXC and is responsible to pay a landline carrier, such as Qwest, for terminating access. The PSC merely approved of language in the Agreement allowing for this compensation, which is consistent with the Telecommunications Act and FCC decisions.

In 1994, the FCC temporarily prohibited CMRS providers, such as Union, from filing tariffs for interstate access service. *Implementation of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Service*, 9 FCC Rcd 1411, ¶ 179 (1994). The FCC has taken notice and comment concerning the appropriate intercarrier compensaiton for wireless traffic, but has not lifted this temporary prohibition.

In *Sprint Spectrum, LP v. AT&T Corp.*, 168 F. Supp. 2d 1095, 1100-01 (W.D. Mo. 2001), Sprint PCS, a CMRS, attempted to collect access charges from an IXC, AT&T. Under the primary jurisdiction doctrine, the court referred the case to the FCC to obtain a ruling as to whether and under what circumstances a wireless carrier could collect access charges from an IXC. *Id.* (noting that "regulation of access charges by CMRS carriers is far from settled from the FCC's perspective at this time"). On referral, the FCC confirmed its prohibition on the use of access tariffs by CMRS providers. The FCC stated that "CMRS access services are subject to mandatory detariffing, and it is therefore undisputed that Sprint PCS could not have imposed access charges on AT&T pursuant to any tariff." *Petition of Sprint PCS and AT&T Corp. For Declaratory Ruling Regarding CMRS Access Charges*, 17 FCC Rcd 13192, ¶ 8 (2002).

Part of the rationale behind not allowing a CMRS access tariffs is that they charge their customers both to make and receive calls. Union charges its customers for the service either through a plan allowing a certain number of minutes of use for a flat rate or per minute use. As such, the wireless customer is already paying rates similar to rates it pays an IXC for a long-distance charge. A landline LEC, like Qwest, does not receive payment from its customer for a non-local call its customer may receive. When a Qwest customer places a non-local call to a Union customer, Union receives an average of $.17 per minute for every minute of the call as an airtime charge from its own customer. That amount is significantly higher than the rate Qwest

receives for terminating calls placed by Union's customers to Qwest's customers.

Although Union argues that the interconnection agreement approved by the PSC results in Union providing a service without compensation, it receives compensation from its customers. The PSC merely approved of language consistent with the current FCC regulations. The interconnection agreement proposed by Qwest and approved by the PSC recognizes the differences between Qwest, a landline LEC, and Union, a wireless CMRS. The court concludes that Union has presented no basis on appeal for reversing the orders of the PSC.

## **CONCLUSION**

Based on the above reasoning, the court finds no basis for reversing the PSC's Report and Order issued April 3, 2008, and subsequent Order issued May 30, 2008. The court upholds the rulings of the PSC with respect to all portions appealed by Union. The Clerk of Court is directed to close the case, each party to bear its or his own fees and costs.

DATED this 6th day of July, 2009.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge